## Bogen v. City of Philadelphia

*Drinker, Biddle & Reath,* for plaintiff.

*John M. McNally, Jr.* and *Martin Weinberg,* for City of Philadelphia.

EISEMAN, J., February 23, 1973.—This matter comes before the court en banc[1] on defendant's exceptions to findings of fact and orders rendered by Judge Spaeth on November 17, 1972, with respect to civil action, April term, 1972, no. 3773.

Specifically, defendant takes exception to findings of fact (ii), (iii), and (iv) wherein the trial judge[2] determined that a seven percent interest rate assumption[3] is "actuarially unsound," the appropriation to the Pension Fund for fiscal 1973 is "actuarially unsound," and an interest rate assumption of six percent is required to arrive at an "actuarially sound" appropriation.

Further, with respect to the trial court's orders, defendant takes exception to 2(a) and 2(b), wherein Judge Spaeth ordered an additional appropriation of $8,032,862 for fiscal year 1973, but provides that this sum could be appropriated in fiscal year 1973 or fiscal year 1974, with the proviso that the city shall add

---

[1] Eiseman, J., Montemuro, A.J., and Rosenberg, J.

[2] Judge Spaeth.

[3] Interest rate assumption is defined as the prediction by the city as to how much interest it will earn on the funds in the pension system.

interest at the rate of six percent in the event the $8,032,862 is paid in 1974.

## HISTORY

These two actions are an outgrowth of the original mandamus proceeding heard by the trial judge in 1967.[4] In that proceeding, he ordered additional appropriations in the amount of $42,000,000 for the years 1967 and 1968 in order to maintain an "actuarially sound" pension fund, in accordance with the requirements of 2-308 of the Home Rule Charter. Thereafter, the city filed a petition to modify the order to enable it to pay the judgment over a 40-year period. The petition was granted, and the city was required to appropriate $2,240,000 each year for 40 years.

In March of 1972, plaintiff, Edwin Dombrowski, filed another action in mandamus, wherein he alleged that the city had again failed to properly fund the pension system for the years 1970, 1971 and 1972. As a result of that proceeding, the court ordered that an additional $47,823,000 be appropriated to maintain an "actuarially sound" pension system.

Thereafter, the city filed a petition to modify this $47,823,000 order to allow it to make the required appropriations over a 40-year period. The trial judge denied this request and ordered the city to allocate the funds over a 20-year span rather than the requested 40. The city has not taken exception to this order and, accordingly, this issue is not before this court en banc.

However, plaintiff also filed another action in mandamus[5] alleging that the city failed to appropriate sufficient funds to maintain an "actuarially sound" pension system for fiscal year 1973. In the

---

[4] Dombrowski v. City of Philadelphia et al., March term, 1967, no. 2348, 431 Pa. 199, 245 A. 2d 238 (1968).

[5] C. P., April, 1972, no. 3773.

same order in which the city was granted 20 years to pay off the $47,823,000, representing 1970, 1971 and 1972, the trial court made the findings and orders to which the city has taken these exceptions. It is these exceptions which are before this court en banc for review.

## DISCUSSION

At the outset it must be noted that the issues before this court en banc arise out of the mandamus proceeding[6] initiated by plaintiff, Cyril Bogen, wherein he alleged that the funds appropriated for fiscal year 1973 were not sufficient to maintain an "actuarially sound" pension system in accordance with the requirements of the Home Rule Charter.

Essentially, plaintiff contended that the two key assumptions which were used in determining the pension fund appropriation for 1973 were "actuarially unsound." Those assumptions are called the interest rate assumption[7] and the salary rate assumption.[8] In calculating the appropriation in question, approximately $80,000,000, the city used a seven percent interest rate assumption and 3.75 percent salary rate assumption.

While the trial judge determined that 3.75 percent salary rate assumption was "actuarially sound," he held that a seven percent interest rate assumption was "actuarially unsound," and that a six percent interest rate assumption would be appropriate. Accordingly, the court applied this six percent interest

---

[6] C. P., April, 1972, no. 3773.

[7] The interest rate assumption as noted heretofore is defined as the prediction by the city as to the amount of interest they will earn on the funds in the pension system.

[8] The salary rate assumption is the prediction as to the average annual salary increase for city employes during a given period of years.

rate assumption and mathematically computed that the fund required an $8,000,000 additional appropriation to make it "actuarially sound."

## ACTION IN MANDAMUS

The court initiates its review with a discussion of mandamus.

Mandamus[9] is a writ of great antiquity. It is extraordinary in character and is a high prerogative writ, used as a last resort rather than as a mode of common redress. It is one of the most extraordinary writs known to the law: Tanenbaum v. D'Ascenzo, 356 Pa. 260, 51 A. 2d 757 (1947), and Zaccagnini v. Vandergrift Borough, 395 Pa. 285, 150 A. 2d 538 (1959).

The law clearly states that an action in mandamus is essentially equitable in nature, requiring application of equitable doctrines. See Dombrowski v. Philadelphia, 431 Pa. 199, 245 A. 2d 238 (1968), and Francis v. Corleto, 418 Pa. 417, at 429, 211 A. 2d 503, 509 (1965).

With respect to the power of a court in a mandamus proceeding to review acts of public officials in the performance of their duties, our law provides that mandamus lies to compel and command public officials in the performance of their legal duties when the duties are ministerial in character: Tanenbaum v. D'Ascenzo, supra. See also Rose Tree Media School

---

[9] "Lat. We Command. This is the name of a writ, formerly a high prerogative writ, which issues from a court of superior jurisdiction, and is directed to a private or municipal corporation, or any of its officers, or to an executive, administrative or judicial officer, or to an inferior court, commanding the performance of a particular act therein specified, and belonging to his or their public, official, or ministerial duty, or directing the restoration of the complainant to rights or privileges of which he has been illegally deprived": Black's Law Dictionary Rev. 4th Ed.

District v. Department of Public Instruction, 431 Pa. 233, 244 A. 2d 754 (1968); Volunteer Firemen's Relief Association v. Minehart, 415 Pa. 305, 203 A. 2d 476 (1964); Meadville Area School District v. Department of Public Instruction, 398 Pa. 496, 159 A. 2d 482 (1960); Mellinger v. Kuhn, 388 Pa. 83, 130 A. 2d 154 (1957); Maxwell v. Farrell School District Board of Directors, 381 Pa. 561, 112 A. 2d 192 (1955); Dechert, Controller of the City of Philadelphia v. Commonwealth, 113 Pa. 229, 6 Atl. 229 (1886). In addition to commanding performance of ministerial acts, the court can compel the *exercise* of discretionary acts; *but unless that discretion is arbitrarily, capriciously or fraudulently exercised or is based upon a mistaken view of the law, a court cannot control the official's discretion or judgment:* Travis v. Teter, 370 Pa. 326, 87 A. 2d 177 (1952); Garratt v. Philadelphia, 387 Pa. 442, 127 A. 2d 738 (1956); Maxwell v. Farrell School District Board of Directors, 381 Pa. 561, 112 A. 2d 192 (1955).

As the court stated in Travis v. Teter, supra, at 330-31:

"It is well settled that in a mandamus proceeding a Court can compel a public official who is vested with a discretionary power to exercise that discretion; but (unless the discretion is arbitrarily or fraudulently exercised or is based upon a mistaken view of the law) it cannot interfere with or control the official's discretion or judgment. Expressed another way, it is the discretion and judgment of the official (who is vested with a discretionary power) which prevails and not that of a Court or a jury or a person aggrieved; and a Court cannot compel such official to exercise his discretion in a manner which will produce a result which the Court may deem wise or desirable: Kaufman Construction Co. v. Holcomb, 357 Pa. 514, 55 A. 2d 534; Tanenbaum v. D'Ascenzo, 356 Pa. 260, 51 A. 2d

757; Anderson v. Philadelphia, 348 Pa. 583, 36 A. 2d 442; Souder v. Philadelphia, 305 Pa. 1, 156 A. 245."

Therefore, two issues arise for determination: (1) Are the acts in question ministerial or discretionary; and (2) if discretionary, is there any evidence which indicates that they were *exercised* arbitrarily, fraudulently, capriciously or in error of law.

First, with respect to whether the acts are ministerial or discretionary, a ministerial act has been defined as one in which a "public officer is required to perform upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority": Meadville Area School District v. Department of Public Instruction, supra; 17 McQuillin on Municipal Corporations, §51.19.

Thus, in relation to the instant case, it is true that the finance director must act "in obedience to the mandate of legal authority," that is, he must exercise the discretion to maintain an "actuarially sound" pension system, which is sufficient to cover normal cost[10] and interest on unfunded liability.[11]

However, it should be noted that in the exercise of the discretion there appears to be no standard which dictates the assumptions which must be employed to finally arrive at the appropriation other than the end result must be "actuarially sound." Accordingly, the finance director has the discretion under the law to

---

[10] Normal cost is that amount which must be contributed annually to provide benefits upon retirement for present city employes based upon their current and future service: Dombrowski v. Philadelphia, supra.

[11] Unfunded accrued liability is the amount required to provide retirement benefits for employes covered by the system based upon their service prior to the current year: Dombrowski v. Philadelphia, supra.

use various key assumptions[12] in order to arrive at this result.

In view of the many judgment decisions in arriving at an "actuarially sound" pension system, the court must conclude that it is an act of discretion on the part of the city representative rather than a purely ministerial act.

With respect to these discretionary acts culminating in the final appropriation, a careful review of this record reveals no action by the finance director which in any way is arbitrary, fraudulent, capricious or in error of law. To the contrary, it appears clear to this court that the finance director acted with the utmost of good faith. Failing to find any arbitrary, fraudulent, capricious or act in error of law, this court finds itself without authority to control the finance director's discretion: Commonwealth ex rel. Kelley v. Pommer, 330 Pa. 421, 199 Atl. 485 (1938).

On the subject of whether the conduct of the finance director was either arbitrary, fraudulent or capricious, the following factors should be noted: In fiscal year 1972, the City of Philadelphia appropriated only $43,000,000 to the retirement system. In fiscal year 1973, after Mr. Moak assumed his responsibilities, the city appropriated approximately $80,000,000, almost twice the amount of the prior year.

In addition, the record reveals that at the time the new finance director took office in the year 1972, the pension fund portfolio was invested in low yield short-term securities yielding only a five percent rate of return. Under the stewardship of Mr. Moak, the city employed an investment advisory firm to review the pension fund portfolio.[13] Upon the recommenda-

[12] Interest rate assumption and salary rate assumption.

[13] N.T. p. 89.

tion of these investment advisors, the pension fund's portfolio was reinvested in high yield long-term grade A corporate bonds, resulting in an average yield to maturity of 7.22 percent.[14] It was based upon this 7.22 percent yield to maturity that the interest rate assumption was raised to 7 percent.

Moreover, the trial court's original order in 1967 required the city to appropriate as follows:

"The City's share of the system's normal cost plus interest on the system's unfunded liability as those amounts are determined by the *City's* actuary." (Italics supplied.)

It is clear that the city has complied with this order. The city's actuary unequivocally stated that the appropriation to the pension fund for fiscal 1973 is "actuarially sound."

"Q. So that on that basis, is it or is it not your opinion that it's actuarially sound to use the 7% assumption for the yield with the yield to maturity of 7.22 and a corresponding 3.75% assumption for the salary increase?

"A. Yes, sir. There is in our opinion ample justification for a 7% assumption in this case because the whole procedure in investment of the City has changed drastically over the last year, and they're now achieving better than our assumed rate. We see no reason to assume that they will fail to maintain something of this order."

In addition, the record reveals that Mr. Moak was formerly associated with the Pennsylvania Economy League and, in fact, informally collaborated with the original plaintiff, Mr. Dombrowski, in his first pension action against the city.[15] Hence, Mr. Moak is well

---

[14] N.T. p. 84.
[15] N.T. pp. 58 and 59.

aware of the varied problems concerning proper funding of the pension system and is making a good faith effort to correct former abuses.

As an illustration of his good faith, the finance director has wisely recommended and the law department has agreed that the city undertake a yearly review of the "actuarial soundness" of the fund as opposed to the five year review which is presently used. This would serve to make an annual assessment to determine if the fund is maintaining a 7.22 percent yield to maturity,[16] thus affording the city an annual opportunity to correct errors of judgment. This view is supported by the city actuary who testified that a yearly review is "actuarially sound" and, in fact, is done in most commercial plans.[17]

"Q. Well, now, would a judgment of actuarial soundness be that the 7% figure may be different according to whether evaluation took place every year or every five years?

"A. I think it would, sir, if the judgment were made contingent on the fund's maintaining its performance."

Finally, Mr. Moak's testimony firmly convinces this court that he acted in good faith and not arbitrarily, fraudulently or capriciously. His following comment adds credence to this effort:

"What I am attempting to do in this is to set the City on a course of action and get a set of commitments which are well understood by the political leadership of the community."[18]

Therefore, the court holds that the finance director acted in a discretionary capacity and that this discretion was not exercised arbitrarily, capriciously, fraudulently or in error of law.

---

[16] N.T. p. 145.
[17] N.T. p. 144.
[18] N.T. p. 66.

## SEPARATION OF POWERS

In arriving at its determination, the court is concerned with maintaining a proper balance between governmental powers. "It is a well-settled maxim that under our theory of the separation of powers of government, legislative, judicial and executive, the powers of each branch must be preserved to it": Wilson et ux. v. Philadelphia School District, 328 Pa. 225, 195 Atl. 90 (1937).

As the court stated in Hayes v. Scranton, 354 Pa. 477, 47 A. 2d 798 (1946):

"The courts will not interfere with the exercise of the discretionary powers vested in public officials to write municipal budgets in the absence of action by them which results from caprice, ignorance, arbitrariness or fraud amounting to abuse of power."

Accordingly, in the absence of findings by the trial court concerning arbitrary, fraudulent or capricious determinations by the finance director, and in view of the good faith displayed by the city for the fiscal year 1973, this court is compelled to hold that the trial court should not have substituted its discretionary judgment for that of the finance director.

## BURDEN OF PROOF

In view of the importance of these proceedings to a large segment of our society, this court is impelled to review seriatim and in detail the evidence in these proceedings, bearing in mind that plaintiff is duty bound to sustain the burden of proof.

The trial court found that a seven percent interest rate assumption was "actuarially unsound." Two reasons supported this conclusion: First, there was no reasonable expectation that a seven percent interest rate could be earned over a relatively long period. Second, assuming a seven percent interest rate as-

sumption might otherwise be "actuarially sound," it is not sound in conjunction with a 3.75 percent salary rate assumption. Plaintiff's evidence fails to support its burden of proof on either of these conclusions.

### Interest Rate Assumption

First, with respect to an expectation of earning seven percent over a reasonable period of time, plaintiff offered no competent evidence that the city would *not* be able to earn seven percent interest over a reasonable period of time. Plaintiff's actuarial expert witness was Kenneth Ross, a consulting actuary for Huggins and Co. It was clearly within his expertise to testify as to actuarial matters. However, it is just as clear that he possessed no expertise as to economic matters. In fact, the record reveals Ross' admission as to this fact:[19]

"Q. Mr. Ross, what comment can you make on this assumption in terms of the likelihood of a continual 7.22% return?

"A. *Of course, this gets into the question of economics, and I'm no economist . . .*"

The court agrees with this candid expression of Mr. Ross and notes that plaintiff failed to introduce competent evidence on this subject.

Further, it should be noted that neither of the actuaries who testified on behalf of the city expressed an opinion as to the expectation of earning seven percent interest over a reasonable period of time. Hugh Gillespie declined to express an opinion, stating it was outside the realm of his expertise:

"Q. Now your opinion that 7% was reasonable is, as I heard you give it, subject to the qualification that it's as you put it, reasonable if you can legitimately

---

[19] N.T. p. 230.

make the assumption that the yield will continue into the future to be as high as it is now?

"A. That's true.

"Q. On that, you're passing no opinion because that's not within the realm of an actuary?

"A. That's right."[20]

It should be further noted, when Aubrey White, the city's consulting actuary, attempted to express an opinion as to whether a seven percent interest rate could be expected over a reasonable period of time, counsel for plaintiff vigorously objected on the basis that he was not qualified to state such opinion, and was properly sustained by the court.

"Q. Now, reasons 3 and 4 go together. I want to ask you to refer to them and give your opinion of the expectation of being able to maintain a 7% return in the near future.

"MR. SAWYER: Objected to. He's an actuary, not an investment advisor."[21]

Thus, it is apparent to this court that none of the witnesses who testified were qualified to express an opinion concerning the expectation of future earnings on investment of seven percent over a reasonable period of time.

*The only uncontradicted evidence on this subject is to the effect that the interest on investment is presently earning 7.22 percent and shall continue to so yield until maturity.*

This court cannot overlook the fact that when a plaintiff commences a law suit, he has a burden of proving his case by competent evidence. In view of Mr. Ross' disavowal of any expertise on the subject of the ability of the fund to earn at least seven percent

---

[20] N.T. p. 165.
[21] N.T. p. 103.

interest rate in the future, and plaintiff's failure to introduce any other competent evidence on this subject, this contention of plaintiff must fail.

On the subject of burden of proof, the distinguished trial judge in an able opinion stated on the pertinent issues the following:

"Plaintiff has failed to prove that the Retirement System's salary rate assumption of between 3½% and 4% is not actuarially sound. As has been discussed, the Court has misgivings about whether the salary rate assumption is in fact sound; one cannot come from the cross-examination of Mr. White without the suspicion that there still has been no adequate allowance for probable salary inflation. To give effect to such misgivings, however, would be to mistake the purpose of a lawsuit. *The question is not whether the salary rate assumption is in fact actuarially sound but whether plaintiff has proved that it is not.* The Court does not think he has and therefore finds that a salary rate assumption of between 3½% and 4% is actuarially sound."

Further, the trial judge stated, on page 45:

"The record powerfully demonstrates that an interest rate assumption of 7% is not actuarially sound, both because it is too far from a salary rate assumption of between 3½% and 4%, and because there is no evidence that would support a finding that there is a reasonable expectation that 7% interest can be earned over a relatively long period."

This court is in full agreement with the following statement made by the trial court: "The question is not whether the salary rate assumption is actuarially sound, but whether the plaintiff has proven that it is *not.*" That is the precise requirement of the legal burden of proof in this case.

It will be noted, however, in the very same opinion

as quoted above on the subject of interest rate assumption of seven percent, the court stated it was actuarially unsound "because there is *no evidence* that would support a finding that there is a reasonable expectation that a 7% interest can be earned over a relatively long period." With this, this court disagrees. It is not the duty of defendant to disprove but rather the duty of plaintiff to prove its cause of action, to wit, that there is *not* a reasonable expectation that seven percent can be earned over a relatively long period.

In support of this position, we quote our learned colleague by the substitution of the term "interest rate assumption" in lieu of the term "salary rate assumption." "The question is not whether the [interest rate assumption] is in fact actuarially sound, but whether the plaintiff has proved that it is *not.*" It is, therefore, apparent that this burden of proof was not sustained by plaintiff in this respect.

Since, however, this court is bound to give credence to the conclusions of the fact finder when based upon competent evidence, the court analyzes further by review the testimony of Mr. Ross. This review is made since the trial court appeared to rely upon his testimony to support the conclusion that the seven percent interest rate assumption was not sound.

An actuary expresses his opinion based upon experience and statistical analysis on the subject matter involved gathered from a period of prior years. He draws his conclusions mathematically from this information as gathered, and thus is in a position to render opinions on the subject matter involved.

With this in view, the court analyzes the testimony of Mr. Ross.

First, it should be noted that his primary field of expertise is in the field of the Pennsylvania State Retirement Fund. It should be noted, however, that

the Pennsylvania State Retirement Fund is one in which the interest rate assumption is statutorily imposed at four percent. Accordingly, this experience only serves to give Mr. Ross a distorted picture on the subject of interest rate assumption, since he has no occasion to make such assumption for this fund. Secondly, in the preparation of his statistics, he relied, among other things, upon the pension fund statistics in eight States where similarly the interest rate assumption is likewise statutorily imposed. Accordingly, these statistics are likewise faulty for the purpose for which used.

He then advised that he attended a hearing in Texas and heard an investment advisor mention that interest rates had exceeded six percent only 10 times in 110 years. He fails to name the expert or the qualifications of this alleged expert and further casts doubt on the probative value of this evidence when he testified:

". . . an investment expert mentioned, *and I don't have any basis of checking his information* so that may not be completely true . . ."[22]

Further, in formulating his interest rate assumption, he relied upon interest rate data received from a group of life insurance companies published by the Institute of Life Insurance Companies. This was introduced without any foundation as to whether there was any comparability to the funds at issue in these proceedings. Without such showing, the statistics are valueless.

In a matter of this importance, where a litigant alleges that city officials have not complied with the law, it is incumbent upon the moving party to support his claim and sustain his burden of proof with competent probative and legally admissible evidence. Since

---

[22] N.T. p. 230.

the statistics upon which Mr. Ross based his conclusions appear to be faulty, this court can only conclude that his final analysis on the subject of the interest rate assumption can only be faulty.

Plaintiff's failure to introduce any other experts on this subject of interest rate assumption leaves the record barren of any testimony which would refute seven percent interest rate assumption used by the city. Certainly, it is not defendant's responsibility to disprove an allegation which plaintiff has failed to prove.

Accordingly, this court is compelled to hold that there was no legal evidence upon which the trial court could conclude that a seven percent interest rate assumption was not valid.

### Tandem Theory

In addition to holding that a seven percent interest rate assumption is "actuarially unsound" because there is no expectation that a seven percent interest rate will continue in the future, the trial court also held that even if a seven percent interest rate assumption standing alone is "actuarially sound," when used in conjunction with a 3.75 percent salary rate assumption it is "actuarially unsound." The trial court predicated this conclusion upon the theory that the two assumptions must function "in tandem."

After carefully reviewing the record, this court again holds that plaintiff has failed to sustain his burden of proof with respect to this "tandem relationship."

Upon review it appears that the "tandem" theory[23] was first mentioned by Hugh Gillespie, one of the actuaries who testified on the city's behalf. He said that there is a general "rule of thumb," which he

---

[23] N.T. p. 167.

"believed could be backed up by other actuaries,"[24] and which says that when the interest rate assumption increases by one percent, the salary rate assumption should also increase by one percent.

However, this court cannot premise a decision upon vague "general rules of thumb" or conjecture. Rather, it is the concern of the court that the City of Philadelphia maintain "actuarial soundness." If government officials have failed to perform their responsibility in properly funding the pension plan, this court should make every effort to insure the fiscal propriety of the system. However, such a determination cannot be based upon unsupported "rules of thumb."

While the city's actuarial assumptions were in excess of this so-called two percent rule of thumb, there is affirmative testimony by the city's consulting actuary that a seven percent interest rate assumption and a 3.75 percent salary rate assumption is "actuarially sound."[25]

In addition, plaintiff's actuary, Mr. Ross' testimony further undermined this "rule of thumb":

"Q. There is no general rule that there must always be no more than a 2% differential between salary assumption and interest assumption; isn't that correct?

"A. There is no general rule, that's right."[26]

Mr. Ross cast additional doubt on this "rule of thumb" when he said:

"I would probably be prepared to stretch it though. I wouldn't regard it as something that was not subject to possible change."[27]

Furthermore, the city's consulting actuary testified

---

[24] N.T. p. 167.
[25] N.T. pp. 189 and 190.
[26] N.T. p. 239.
[27] N.T. p. 233.

that it was *not* his opinion that there must always be a two percent differential between the interest rate assumption and the salary rate assumption:

"Q. Now let me ask you, as an actuary do you have an opinion as to whether or not there is an inflexible rule that the differential between the interest assumption and the salary assumption be more than 2%?

"A. That is *not* my opinion."[28]

Moreover, there is ample justification for using a 3.75 percent salary rate assumption in determining the pension fund appropriation. The record reveals that salary increases to a large extent, have been "catch-up"[29] in nature during the past several years of inordinate increases, and are expected to increase at a much slower rate during the next few years.[30] In fact, with the exception of the past five years, the rate of pay increases for the city has been between 3.3 percent and 3.6 percent.[31] The trial court accepted the "catch-up" principle in determining that the 3.75 percent salary rate assumption is reasonable.

This is confirmed by Mr. White's testimony, which indicates that the unusual increases of the past several years should not be incorporated in the actuarial assumptions:

"Q. . . . This year you had increases which, let's say, averaged 5%—between 5½ and 4¾. Why don't you take that instead of 3?

"A. Again because we don't think that it is yet

---

[28] N.T. p. 189.

[29] "Catch-up" increase is an abnormal annual salary increase granted by employers to equalize the salary of its employes with salaries paid for comparable work in other industries.

[30] N.T. p. 192.

[31] N.T. p. 131.

proven that this is clearly going to continue at this point."[32]

Finally, his testimony clearly reveals that it is *not* sound for an employer to incorporate steep salary increases in the actuarial assumptions:

"A. . . . *We feel that it is not sound for an employer exposed to bargaining to incorporate very steep salary scales since we assume that the employees will take this as a tacit agreement that they will give at least that much in any future year.*"[33]

Accordingly, in view of all of the above, the court holds that plaintiff has not met its burden of proving that a seven percent interest rate assumption, when used in conjunction with a 3.75% salary rate assumption, is "actuarially unsound."

## SUMMARY

In summary, therefore, the court, in making a determination, reviewed each possible legal theory in an effort to support the necessary favored inference to be drawn from the fact finder's decision. However, the court is compelled to conclude that: (1) The minimum requirements of mandamus action have not been sustained; and (2) the required burden of proof has failed. Under the circumstances, the exceptions of defendant must be sustained.

## ORDER

And now, to wit, February 23, 1973, it is ordered and decreed that:

---

[32] N.T. p. 131.
[33] N.T. p. 129.

1. Defendant's exceptions to the trial court's findings of fact (ii), (iii), and (iv) and orders 2(a) and (b) are hereby sustained; and

2. Further, the parties are directed to comply with the trial court's order as amended by this opinion and order.