# Weister *et al. versus* Hade *et al.*, School Directors.

1. A township being unable to procure volunteers under the Bounty Law of 1864 for $300, the citizens voluntarily advanced money to pay bounties beyond that amount, with the understanding that it was to be repaid when a law was passed authorizing taxation to repay them. An act was passed authorizing taxation to repay all "*loans made in good faith.*" *Held*, that this law authorized the repayment of the sums so advanced.

2. The *loans* contemplated were not loans in a *legal* sense, they had reference only to claims upon the conscience and moral sense of the community relieved thereby.

3. The Constitution of the United States must have a strict construction; that of the state a liberal one. Congress can pass no laws but such as the Constitution authorizes; the state legislature can legislate on all subjects not prohibited.

4. The power of the legislature to tax is-without limit, and may be applied to all objects promotive of the general good, although remote and indirect.

5. The maxim "*omnis ratihabitio retrotrahitur et mandato æquiparatur,*" applies to the public as well as to individuals.

6. The legislature has the power to legislate retrospectively in all matters not penal, not in violation of contracts, and not forbidden by the Constitution; and can act directly on individual rights.

THIS was an appeal from the decree of the Court of Common Pleas of *Franklin county*. In Equity.

Jacob Weister and a number of others, taxpayers of Antrim township, Franklin county, filed a bill against Joseph Hade and others, school directors of the township, to restrain them from levying a tax to pay money advanced to pay bounties to volunteers.

After the Bounty Act of 1864 the township became liable to a draft of sixty-one men. The school directors under that act raised money enough to pay $300 bounty. It was found, however, that substitutes could not be obtained for less than $500. An effort was made to raise the difference by voluntary contributions, which was found to be impracticable. Subscriptions were then solicited, with the understanding that they should be repaid when a law authorizing a tax for the purpose should be passed, and with this understanding the money for the extra $200 bounty was raised.

On the 1st day of March 1865 an act was passed, entitled "An Act authorizing the collection of a tax for the payment of bounties to volunteers, in excess of the sum allowed by law in the county of Franklin, which provided, 'That the several wards, boroughs and districts of Franklin county be, and the same are hereby authorized to levy and collect sufficient tax to pay the sum of five hundred dollars to volunteers enlisted prior to the 19th of December 1864. Whenever that sum was paid, all loans made in good faith for the payment of the excess of two hundred dollars to each recruit are hereby legalized, and the same shall be paid out of the tax hereby authorized to be collected. The bounty tax for said excess shall be levied and collected in accordance with the provisions of the Act of 25th August 1864, entitled A supplement to an act relating to the payment of bounties to volunteers.' "

[Weister v. Hade.]

Under this act the school directors levied and were proceeding to collect the tax, when the bill was filed and they were restrained by a preliminary injunction, which was afterwards dissolved and the bill dismissed. This was assigned for error.

*D. W. Rowe, J. McD. Sharpe* and *F. M. Kimmell*, for appellants, cited Speer *v.* Blairsville, 14 Wright 150; Phila. Asso. *v.* Wood, 3 Id. 73; Sharpless *v.* Philadelphia, 9 Harris 147.

*W. S. Stenger* and *McClure & Stewart*, for appellees, cited Speer *v.* Blairsville and Sharpless *v.* Philadelphia, *supra*.

The opinion of the court was delivered, June 25th 1866, by

AGNEW, J.—We decided in Speer *v.* School Directors of Blairsville, last year, that the legislature has power to authorize a municipality to borrow money and levy taxes to pay bounties to volunteers, in relief of the district from an impending draft. This has been reaffirmed at the present term in the case of Ahl *v.* Gleim & Shelby. We then held that the power to create a public debt and liquidate by taxation is too clear for dispute, where the purpose is a public one concerning the common welfare and interest of the municipality: That Congress opened the door to volunteers in relief of the community from the draft, and invited its co-operation in procuring volunteers: That military service is a burthen and stern demand of war, which the citizens are called on to perform, and involves not only those in the ranks, but all who remain at home, who must assist in other forms to bear the burthen, and are interested in the selection of those who go: That the bounty paid is therefore not a private transaction, but concerns the public by inducing volunteers to take upon themselves the public duty and the risks of service, and thereby relieving the community from the apprehensions and the ills of an indiscriminate draft by lot. Its benefit to the community far transcends in importance those of many other recognised public objects. We further held that money raised by loans and taxation for such a public municipal purpose is not money obtained for or a loan of or credit to any corporation association or party within the constitutional amendment of 1857.

These positions are settled, and we do not propose to renew their discussion. But the new aspects now presented seem to require a re-examination of the extent of the legislative authority. After bill and answer, the case was referred to an examiner, whose report presents the facts in a lucid and well-digested view. They may be succinctly stated. Antrim township, Franklin county, after the passage of the general Bounty Act of March 25th 1864, became liable to a draft for a military quota of sixty-

[Weister *v.* Hade.]

one men. In pursuance of that law the school directors raised money to pay a bounty to volunteers of $300 each, to relieve the township from the draft. But it was found to be impossible to raise men at this sum, the bounty having risen to $500. The citizens held meetings to raise money to pay the extra $200, but failing to raise it by donations, succeeded in obtaining it by subscriptions founded on the assurance that a law could be procured authorizing them to be refunded by taxation.

A special act for Franklin county was accordingly passed on the 8th March 1865, Pamph. L. 288, and the school directors of Antrim township proceeded to levy a tax to repay the extra $200 to the subscribers. When they had collected and paid about half of the subscribed amount, this bill was filed to enjoin against further proceedings. Two questions are raised, one upon the interpretation, and the other on the constitutionality of the law. It is entitled " An Act authorizing the collection of a tax for the payment of bounties to volunteers *in excess* of the sum allowed by law in the county of Franklin." It authorizes the levy and collection of sufficient tax to pay the sum of $500 to volunteers enlisted prior to the 19th of December 1864, and proceeds thus : " Whenever that sum was paid, *all loans made in good faith* for the payment of the excess of $200 to each recruit are hereby legalized, and the same shall be paid out of the tax hereby authorized to be collected."

It is argued that the term loans in this act means debts contracted by persons authorized to borrow the money and make the township responsible, while the subscriptions were but gifts, with a mere expectation of return when legislative authority should be procured.

The examiner and the court below thought this was not the true meaning of the law, and we concur with them. It is patent on the face of the act that the legislature knew they were not loans in any proper or legal sense. Under the general Act of 1864, loans and taxes could not be raised to pay bounties exceeding $300. When the legislature legalized loans made in good faith for the payment of the excess, they had reference to claims only upon the conscience and moral sense of the community relieved thereby. The examiner finds the fact that those loans were subscribed and paid upon the solicitation of authorized committees of the citizens, with a distinct understanding that a law should be procured, if possible, authorizing repayment. We must conclude that the legislature intended to legalize these claims, and this brings us to the question of their constitutional power.

What we said in Speer *v.* School Directors was thought sufficient to prove the legislative authority in that instance ; but as this case is supposed to draw more deeply upon the fountain of power, we shall add something more, and cite further decisions.

[Weister v. Hade.]

The want of unanimity in the court before seems to require that we should not only refer to, but recite the language of former decisions, to show that in our views of constitutional power we have followed the same path trodden by our predecessors. The theory of the State Constitution has been settled by repeated decisions so authoritative, we cannot now alter it if we would.

Black, C. J., states the theory thus in Commonwealth v. Hartman, 5 Harris 119:—"It is to be remembered that the rule of interpretation for the State Constitution differs totally from that which is applicable to the Constitution of the United States. The latter must have a strict construction; the former a liberal one. Congress can pass no laws but those which the Constitution authorizes either expressly or by clear implication, while the Assembly has jurisdiction *of all subjects* on which its legislation is not prohibited. The powers not granted to the Union are withheld, but the state retains every attribute of sovereignty which is not taken away." The same proposition is stated by the late Chief Justice Gibson in the following nervous language:—"But it is a postulate of the State Constitution which distinguishes it from the Federal, that all the power of the people is delegated by it except such parts as are specially reserved:" Kirby v. Shaw, 7 Harris 260. In Sharpless v. Mayor of Philadelphia, 9 Harris 161, Chief Justice Black elaborates this statement with great force, and sums up his conclusion in these words:—"To me it is as plain that the General Assembly may exercise all the powers which are properly legislative, and which are not taken away by our own or by the Federal Constitution, as it is that the people have all the rights which are expressly reserved." He adds:—"We are urged, however, to go further than this, and to hold that a law, though not prohibited, is void if it violates the spirit of our institutions or impairs any of those rights which it is the object of a free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this. The constitution has given us a list of the things which the legislature may not do. If we extend that list, we alter the instrument; we become ourselves the aggressors, and violate both the letter and spirit of the organic law as grossly as the legislature possibly could."

All this has been summed up by the present chief justice in The Commonwealth v. Maxwell, 3 Casey 456, in the following terse statement:—"A law that is unconstitutional is so because it is either an assumption of power not legislative in its nature, or because it is inconsistent with some provision of the Federal or State Constitution." In The Commonwealth v. McWilliams, Justice Bell used the following language:—"Of late years it has been much the fashion to impeach the action of legislative bodies as unconstitutional when it happens not to accord with the

party's notion of propriety and abstract right. This is frequently done in their oblivion of the doctrine that express prohibition or necessary implication is essential to oust the legislature of authority. When this prohibition is not found in the primordial part, the exertion of a power cannot be deemed unconstitutional even though it seems to trespass upon our ideas of natural justice and right reason." Justice Rogers, in The Commonwealth *v.* McCloskey, 2 Rawle 374, had stated the same thought more strongly. "If the legislature," he said, "should pass a law in plain and unequivocal language within the general scope of their constitutional powers, I know of no authority in this government to pronounce such an act void merely because, in the opinion of the judicial tribunals, it was contrary to the principles of natural justice; for this would be vesting in the court a latitudinarian authority which might be abused, and would necessarily lead to collisions between the legislative and the judicial departments dangerous to the well-being of society, or, at least, not in harmony with the structure of our ideas of natural government."

In the case of The Louisville and Nashville Railroad Company, in the county of Davidson, decided by the Supreme Court of Tennessee, and to be found reported in Livingston's Law Magazine for June 1855, p. 369, Caruthers, J., discussing this question, uses this language:—"It is not for the judiciary or the executive department to inquire whether the legislature has violated the genius of the government or the general principles of liberty and the rights of man, or whether acts are wise and expedient or not; but only whether it has transcended the limits prescribed for it by the Constitution. By these alone is the power of that body bounded; that is the touchstone by which all its acts are to be tested; there is no other. It would be a violation of first principles, as well as their oaths of office, for the courts to enact any other standard."

The law in question is a tax law, and testing it by these principles of interpretation, we find the power of taxation without limits in the Constitution. This was so fully stated in Speer *v.* School Directors, I shall not repeat it, but merely restate the conclusions of Chief Justice Gibson and Chief Justice Black. The former said, in Kirby *v.* Shaw, 7 Harris 260:—"As regards taxation, there is no limitation of it. Equality is not enjoined by the bill of rights, and probably because it was known to be impracticable." The latter said in Sharpless *v.* Mayor of Philadelphia, 9 Harris 168:—"I use the language of Chief Justice Marshall (4 Wheat. 316) when I say that it may be exercised to any extent to which the government may choose to carry it, and that no limit has been assigned to it, because the exigencies of the government cannot be limited." Further:—"I am of opinion with the Supreme Court of Kentucky (J. B. Monroe 345), that a tax law

[Weister v. Hade.]

must be considered valid unless it be for a purpose in which the community taxed has palpably no interest, where it is apparent that a burden is imposed for the benefit of others, and where it would be so pronounced *at the first blush*." Since Speer *v.* School Directors was decided, the case of Booth *v.* Town of Woodbury, supporting the constitutionality of a bounty law, has been decided in the Supreme Court of Connecticut, and is to be found reported in the American Law Register for February 1866, p. 202. In reference to the power and purpose of taxation, Justice Butler remarks :—" In the first place, if it be conceded that it is not competent for the legislative power to make a gift of the common property or of a sum of money to be raised by taxation, where no possible benefit, direct or indirect, can be derived therefrom, such exercise of the legislative power must be of an extraordinary character to justify the interference of the judiciary; and this is *not* that case."

" Second. If there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy, and not of natural justice ; and the determination of the legislature is conclusive. And such *is* this case. Such gifts to unfortunate classes as the indigent, blind, the deaf and dumb or insane, or grants to particular colleges or schools, or grants of pensions, swords or other mementoes for past services, involving the general good indirectly and in a slight degree, are frequently made and never questioned."

These authorities abundantly prove the large grant of power to the legislature ; the unlimited extent of the taxing power ; the undoubted right to apply it to all objects promotive of the general good in any degree, though remote and indirect. Having shown also the positive public purpose of relieving a community from a draft on its able-bodied members for military service ; it remains to see how far the legislature can ratify the payment of money to a public purpose without a precedent authority, and can direct taxation for its repayment. The maxim " *omnis ratihabitio retrotrahitur et mandato æquiparatur*" is applicable to the public as well as to individuals. There is no less reason to apply the right of ratification to the legislative power, which by possession of the right of making laws gives to its ratification greater effect. The moral obligation resting on a community to refund money expended for a public good, is not less obvious than that of an individual, constituting a good consideration in law to support his promise to repay. The form of a *law* is certainly not less efficient than that of a promise. On this point I will use the language of Judge Bell in Lycoming *v.* Union, 3 Harris 170, as not only appropriate, but also as containing a summary of decided cases. He says: " It may be said that assuming the existence of obligation, is in effect, begging the question at issue. But I

do not here use the word as expressive of perfect liability resting on both moral and legal sanctions, and capable of being enforced as well in a court of law as in a court of conscience. I refer to those duties which, resting only in good morals, are sometimes called imperfect obligations, because, though recommended by conscientious conviction, they yet lack a remedy sufficient to compel a due observance of them. These defective obligations, it will be presently shown, have always been esteemed in Pennsylvania vigorous enough to sustain the interposition of legislative aid, without involving a breach of constitutional provision.

" Laying hold upon the principle thus recognised, our legislature has frequently interfered to give effect to those duties of imperfect obligation; and though this exercise of power has been frequently assailed, it has always been sustained in entire consistence with the constitution. Of this class of remedial laws are statutes for rendering effective imperfect acknowledgment of deeds by married women, the effect of which is to bar their estates, Barnet *v.* Barnet, 15 S. & R. 72; Tate *v.* Stooltzfoos, 16 S. & R. 35; Mercer *v.* Watson, 1 Watts 356; those retroactively curing legal defects in legal proceedings, Underwood *v.* Lilly, 10 S. & R. 97; validating pending suits, Bleakney *v.* Bank of Greencastle, 17 S. & R. 64; modifying an existing remedy or removing an impediment in the way of redress by legal proceedings, Bolton *v.* Johns, 5 Barr 145; and to come nearer home, providing for the vindication of an existing right by authorizing an action, where none existed before: Hepburn *v.* Curts, 7 Watts 300; Pittsburgh Turnpike Company *v.* Commonwealth, 2 Watts 433." In the case thus quoted from and involving the taxing power, it was decided that the legislature could compel Lycoming county to pay Union county a fair proportion of expenses before incurred in Union county, in trials concerning the distribution of the proceeds of sale of property lying in both counties.

Of moral obligation, Gibson, J., said in Hess *v.* Werts, 4 S. & R. 361: " Although the contract for reasons of policy was so far void that an action could not be sustained on it, yet a moral obligation to perform it whenever those reasons ceased, remained, and it would be going very far to say the legislature may not add a legal sanction to the obligation on account of some fancied constitutional restriction." As to retroaction, C. J. Gibson used this language in Mercer *v.* Watson, 1 Watts 356: " *Ex post facto* laws are necessarily retrospective: they act on existing rights, or they do not act at all; yet the converse does not hold, for it seems to be universally conceded, since the decision in Calder *v.* Bull, 3 Dallas 386, that retrospective laws are not necessarily *ex post facto*, within the meaning of the constitution. In that case the prohibition was held to be exclusively applicable to penal laws; but in matters of civil jurisprudence, statutes simply retro-

[Weister v. Hade.]

spective have not been disregarded by the courts, but for disobedience of some *plain, palpable and positive mandates of the constitution*." Precisely to the same effect is the language of Duncan, J., in Tate *v.* Stooltzfoos, 16 S. & R. 37. In Gault's Appeal, 9 Casey 94, it was held that the Act of 13th May 1856, giving the owners of lots in Philadelphia two years to redeem from a sale for municipal claims, applies to sales made before the passage of the law, where no deed had been executed. Woodward, J., remarked : " But here comes appellant's most weighty objection, that we give the statute, by such construction, a retroactive and unconstitutional operation. A retroactive statute is not necessarily unconstitutional, else many adjudications in the books would never have been made, of which Satterlee *v.* Matthewson, 16 S. & R. 177, is the most striking example."

A still stronger example of the legislative power operating, not only retrospectively, but also to subject private property to an assessment for what was deemed a public benefit, is to be found in the case of Schenley *v.* Commonwealth, 12 Casey 29. Here an Act of Assembly validating a city ordinance for grading and paving, which had become void for want of being duly recorded, was held not to be unconstitutional, because it provided that the omission to record should not impair the lien of the assessments against the lot-owners. Our brother Strong said in that case, " Now it has repeatedly been ruled in this and other states that the legislature may impose upon a local district a tax to pay the expense of a public improvement already made. Such laws interfere with no contract, and divest no vested rights." Thomas *v.* Leland, 24 Wend. 65, is a remarkable case of this kind.

These cases establish two things : first, the power of the legislature to legislate retrospectively in all matters not penal, not violative of contracts and not expressly forbidden by the Constitution ; second, to act directly upon individual rights. The legislation in such cases is special and immediate, and not simply a consequence arising from the exercise of a general and undoubted power. But in the present case taxation is the exercise of an undoubted and unrestrained power, while it is only the subject of disbursement, which is retrospective ; and it operates not specially upon individuals selected from the mass, but generally and equally.

There are still other cases which perhaps even more strongly illustrate the extent of the legislative power. In Harvey *v.* Thomas, 10 Watts 63, the law authorizing the construction of lateral railroads across the lands of others to connect private property with public improvements, was supported.

The doctrine of the constitutional power of the legislature over private property was there carried to its very verge, if not beyond it, in some of the positions taken in the opinion.

2 P. F. Smith—31

[Weister *v.* Hade.]

But even this seeming amplitude derives a partial countenance from the more recent decision of this court in Stuber's Road, 4 Casey 199, in which it was decided (Lowrie, J., delivering the opinion) that the Act of April 21st 1846, authorizing the court of Quarter Sessions to vacate roads "existing by prescription or lapse of time" is constitutional. Chess *v.* Birmingham, 1 Grant 438, decides that a law authorizing the borough to tax those who use the streets of Birmingham with wagons and other vehicles is constitutional, whether they were residents or non-residents. In Commonwealth *v.* McWilliams, 1 Jones 61, a law authorizing the supervisors to subscribe to the capital stock of a turnpike road company at the cost of the inhabitants was held to be constitutional. This now would be prohibited by the amendments of 1857 ; but with Sharpless *v.* Mayor of Philadelphia, and kindred cases, it still remains as an authoritative exposition of the extent of the taxing power, when there is no express constitutional restriction.

But I will not encumber this opinion with further citations, and only regret that these persistent attempts to deny an undoubted power of the legislature have rendered it necessary to introduce so many in its defence. If there be any virtue in precedents ; if a theory of constitutional interpretation can be established by authority ; if a full legislative power can be proved by numerous judgments of this court, and by the opinions of the most eminent judges, then the warrant of the legislature to pass the act in question is clear beyond a doubt. Private means have been advanced for the public relief upon a well-grounded expectation of repayment at the request of that community, and with its promise that legislation should be obtained to refund it. What provision of the Constitution denies taxation to repay it ? What principle of morality or of natural justice forbids it ? What principle of civil jurisprudence or what reason opposes it ? It is said the money raised was paid for the benefit of a class, to wit, of those only who were enrolled. This is incorrect, but if true, what answer does it afford ? It does not show that the public welfare is not intimately associated with this class, or that classes in a community are not within the public protection for the general welfare.

It would be singular, indeed, if the best manhood of a community—the whole able-bodied citizenship from twenty-one to forty-five years of age—were not a class quite as important to its interests, and as strongly entitled to protection against the burthens of war, as the blind, the deaf, the dumb, the poor, who are daily relieved by taxation. The able-bodied are enrolled, not because they only owe military service, but because they are most fit to perform it. But all are subject to the burthen, which

[Weister v. Hade.]

falls, not on them alone, but on those who remain at home, who are thereby deprived of their labour, support and comfort; who must also pay taxes for their maintenance in the field, support their families in their absence, and maintain them on their return from service, disabled and unfit for labor. But, without elaboration, I will refer to an instance of legislation for the benefit of a class, affording a striking instance how the public welfare is interwoven with it, and expressly decided to be constitutional. In The Commonwealth v. Hartman, 5 Harris 118, the school laws of 1848 and 1849 were held to be constitutional, and were not impliedly forbidden by the constitutional provision for teaching the *poor* gratis, notwithstanding the argument drawn from the maxim, *Expressio unius exclusio est alterius.* Should we view that class between five and twenty-one years of age in the same narrow scope within which those between twenty-one and forty-five years are sought to be drawn, we would be compelled to say their education is not half so important to the public interest as the lives and limbs of those who constitute the bone and sinew of industry, the largest source of revenue, the mainstay of families, and whose skill, talents, public spirit and energy contribute most to the public good. Besides, the primary obligation of education belongs, not to the public, but to the parents. But what primary obligation to bear the common burthen of war lies upon men of any age or class? The fixing of age is but arbitrary, and Congress might have enlarged the boundary in order to fill the forts and garrisons with the younger and the older, in relief of the more able-bodied for active service in the field. Congress recognised this very public interest in the division of the enrolled men into two classes, those between twenty-one and thirty-five, and those between thirty-five and forty-five, making the draft in the first instance upon the younger, upon whom society had the fewest claims, and was the least dependent.

Upon the whole, we find the case with the appellees, and the decree of the court below is therefore affirmed.

WOODWARD, C. J., dissented.
THOMPSON, J., dissented.