Wilson et ux. *v.* Philadelphia School District et al., Appellants.

226

Argued November 12, 1937.   Before Kephart, C. J., Schaffer, Maxey, Drew, Linn, Stern and Barnes, JJ.

*Robert T. McCracken,* with him *George G. Chandler,* for appellants.

*Joseph Sharfsin,* with him *A. L. Shapiro* and *Abraham Wernick,* for appellees.

*N. R. Criss,* Solicitor for School District of Pittsburgh, amicus curiæ.

OPINION BY MR. CHIEF JUSTICE KEPHART, November 16, 1937:

Appellees seek to enjoin appellants from levying and collecting, or attempting to levy and collect, taxes for school purposes in the School District of Philadelphia County for the year 1938 and subsequent years. Nine reasons were assigned for holding the taxing sections of the School Code and its amendments unconstitutional. The preliminary objections to the bill were that it was too late to raise the constitutionality of the School Code, as amended, and that the present bill was barred by the principle of stare decisis as the constitutional objections had been adversely decided in *Minsinger v. Rau,* 236 Pa. 327.

The court below dismissed eight of appellees' nine reasons as having been decided by *Minsinger v. Rau,* supra, and rested its decision on the invalidity of the legislative delegation of the power to fix the tax rate. It held that the Act of March 12, 1929, P. L. 20, amending the School Code of May 18, 1911, P. L. 309, was such a departure from that act with reference to taxing power that a

question not presented in the *Minsinger* case must be considered. As to it the court below held, after a very learned discussion, that the Act of 1929 was an unlawful delegation of power and accordingly decreed the Board of Public Education of the School District of Philadelphia be restrained from levying any tax beyond that provided for in the Act of June 21, 1919, P. L. 555.

The questions presented in this appeal have a much wider scope than those presented to the court below. We consider the theory of delegation of legislative power generally, and specifically the delegation of the taxing power. In conjunction therewith we consider the right of the legislature to delegate to any appointive commission the power to levy taxes. If it be found the Act of 1929 was a lawful grant of power, our inquiry need go no further, but if we should find that the act was an unlawful delegation of power, or such delegation was in violation of Article III, Section 20 of the Constitution as conferring on a special commission the right to levy taxes, there would remain further questions of delay in instituting this proceeding and our power over the decree of the court below.

It is a well settled maxim that under our theory of the separation of powers of government, legislative, judicial and executive, the powers of each branch must be preserved to it; the legislature cannot delegate its powers to enact laws directly or indirectly to any other body or governmental agency: *O'Neil v. Am. Fire Ins. Co.*, 166 Pa. 72. As stated by Chief Justice GIBSON early in our history, in *Case of the Borough of West Philadelphia*, 5 W. & S. 281, 283: "Under a well-balanced constitution, the legislature can no more delegate its proper function than can the judiciary. It is on the preservation of the lines which separate the cardinal branches of the government, that the liberties of the citizen depend . . ."

This principle, though not expressly written in our Constitution, embodies its basic strength if it is to endure as our fundamental law. It has been so considered

since we have been a state; its main essentials have been rigidly adhered to. We have had many cases before this court wherein legislation has been assailed because of the delegation of legislative power. It is impossible in the short time allotted to us for this opinion to attempt to review these cases and set up some all-embracing rule that might be a guide as to what is and what is not a delegation. One cardinal principle stands out, that any fundamental or basic power necessary to government cannot be delegated.

That the power to tax is peculiarly a power of the legislature *(Sharpless v. Mayor of Phila.,* 21 Pa. 147) has never been questioned in this country and has frequently been asserted by our courts: *City of Erie v. Reed's Executors,* 113 Pa. 468; *Butler's Appeal,* 73 Pa. 448; *Balto. & Phila. Steamboat Co.'s Appeal,* 302 Pa. 364; *P. R. R. Co. v. Pittsburgh,* 104 Pa. 522; Gray, Limitations of the Taxing Power (1906), 271-272. The taxing power, one of the highest prerogatives, if not the highest, of the legislature, must be exercised through representatives chosen by the people. It is clearly within the interdiction of this principle of constitutional government against delegation. True, in this state, and in many others, the power to tax has been delegated to and exercised by smaller units of state government, such as municipal bodies chosen by the people. See *Sharpless v. Philadelphia,* supra. For, while the principle of non-delegation of taxing power is the general rule, delegation to municipal authorities has been recognized as lawful: *Butler's Appeal* and *City of Erie v. Reed,* supra; *Durach's Appeal,* 62 Pa. 491; 1 Cooley, Constitutional Limitations (8th ed.), 235, 389; 4 Dillon, Municipal Corporations (5th ed.), sections 1375-1376. This is an exception to the general rule, but such delegation is kept within defined lines, with supervisory control always vested in elective bodies. There are reasons for this exception, at least in this state. Justice SHARSWOOD in *Durach's Appeal,* supra, at pp. 493, 494, said: "Mu-

nicipalities, such as counties, cities and boroughs, are public corporations created by the government for political purposes. They are invested with subordinate legislative powers for local purposes connected with the public good. . . . To carry out these objects [of local government] there must be money, and hence the necessity of taxation for the purpose." These local units of government possess a legislative body chosen by the people, and delegation of power to them does not actually remove this important subject from the control of the people. Justice SHARSWOOD stated that the great principle which lies at the base of our tax institution is popular representation. And see *Thomas v. Gay,* 169 U. S. 264, 276. It was the reliance on this principle that induced the framers of our Constitution to plant in the legislature the taxing power without stint or reservation. As popular representation is one of the attributes of our lesser units of government, it would seem that the theory he speaks of is maintained by delegation to them.

There is another historical reason which supports the right of the legislature to entrust local taxation to municipal governments. Local governmental units, in many instances, antedated federal or state governments and before their inception levied taxes. In this state this is particularly true. Our earliest taxes were levied by the townships under the laws of the Duke of York for poor relief and governmental expenses. Under the proprietary government the county was the taxing unit. When the legislature authorized cities, townships, boroughs and counties to levy taxes, it merely carried on a system that had been historically in existence.

There is no such historical basis to support conferring the taxing power on a school district. Our common school system was not adopted in this state as it exists today until many years after the Revolution, though the Constitutions of 1776, 1790 and 1838, and the laws recognized its vitally important part in our existence. After Thaddeus Stevens' and Governor Wolf's famous

crusade for education, our schools became an integral part of our governmental system, as a *state* institution: *Minsinger v. Rau*, supra, at 331; *Duff v. Perry Twp. School Dist.*, 281 Pa. 87; *Ford v. School Dist.*, 121 Pa. 543; *Board of Education v. Ransley*, 209 Pa. 51. The Constitution of 1874 fortified it and directed the legislature to maintain "a thorough and efficient system of public schools": Article X, Section 1. The school system, or the school districts, then, are but agencies of the state legislature to administer this constitutional duty. As such agencies, they do not possess the governmental attributes of municipalities. They are not municipal corporations: *Wharton v. School Directors*, 42 Pa. 358, not having legislative powers.[1] They have been held to be bodies of a lower grade, with less power than cities, fewer of the characteristics of private corporations and more of mere agencies of the state: *School District v. Fuess*, 98 Pa. 600.[2] They possess only the administrative powers that are expressly granted by the central

---

[1] And, in *Chalfant v. Edwards*, 173 Pa. 246, we said at p. 249: "School directors are by no means municipal officers. They are not invested with any of the municipal powers nor are they charged with the performance of municipal functions."

[2] This becomes increasingly obvious if the various governmental attributes of municipal governments are contrasted with those of the school district. The school district has no police power. It has no power to legislate. It cannot construct highways, bridges and subways. It cannot provide for the relief of the poor. Although the school district possesses power of eminent domain, this is not exclusively a municipal power but is possessed by numerous public utilities conducted for private gain. Like such corporations the school board must post a bond to exercise the power. No such restriction has been placed upon the right of a municipality to take property. See *Delaware County's Appeal*, 119 Pa. 159; Act of May 4, 1927, P. L. 728. The fact that the Constitution has included school districts in Article IX, section 8, imposing limitations upon indebtedness does not stamp them as municipalities. It merely provides that school districts as well as municipalities shall be restricted in their borrowing capacity. See *Lyon v. Strock*, 274 Pa. 541, 543.

government or inferred by necessary implication. The fact that they have the same territorial limits as municipal subdivisions does not change the character of their functions which are not municipal: see *Ayars' Appeal*, 122 Pa. 266, 283. See also *Lehigh Coal & Nav. Co. v. Summit Hill School Dist.*, 289 Pa. 75, 81.

It is no doubt true in this state that the legislature has conferred upon school districts the power to levy and collect taxes for school purposes, and this has been upheld without reference to any definite restrictions placed thereon: *Blair v. Boggs Twp. School Dist.*, 31 Pa. 274; *Wharton v. School Directors*, supra; *Mellor v. City of Pittsburgh*, 201 Pa. 397; *Duff v. Perry Twp. School Dist.*, supra. Laws have been enacted for school districts to levy taxes for purposes other than public education: *Weister v. Hade*, 52 Pa. 474; *Keasy v. Bricker*, 60 Pa. 9; *West Donegal Township v. Oldweiler*, 55 Pa. 257. In none of these instances was the constitutional question of improper delegation of the taxing power raised; moreover, in all of them the directors of the school districts involved were elected by the people and it is now too late to question the power of elective school boards to levy a tax. The first case that considered the question of delegation of taxing power was that of *Minsinger v. Rau*, supra. Prior to this decision, it had been taken for granted that the legislature could empower the school district to levy taxes for educational purposes.

Before discussing this case it is well to review a little of the history of the Philadelphia School District. The Act of March 3, 1818, P. L. 124, provided for the appointment of the first school controllers. It was followed by many acts, the Act of January 23, 1821, P. L. 13; the Act of February 2, 1854, P. L. 21, and the Act of March 15, 1870, P. L. 437, changing the name of the board to the Board of Public Education. While the School District of Philadelphia was governed by appointive officers from the time of its original creation until 1854, the taxes for the school district were levied and collected by

the city or county taxing authorities. Although the Act of 1854 conferred the power to levy taxes upon the board, it was made elective.

With this background and precedent, the Act of 1911 reorganized the public school system; it constituted Philadelphia a school district of the first class, provided for the appointment of a Board of Public Education of fifteen members by the judges of the courts of common pleas (the first boards had been appointed by city councils and county commissioners), and by Section 524 empowered the board to levy an annual tax of not less than five and not more than six mills per dollar of assessed valuation for school purposes. The Act of June 21, 1919, P. L. 555, changed the maximum limit to eight mills and the minimum to six, with an additional half mill for funding of bonded indebtedness. The Acts of April 28, 1921, P. L. 328, and March 12, 1929, P. L. 20, which followed, will be later discussed. In *Minsinger v. Rau,* supra, the delegation of taxing power under the Act of 1911 was challenged. We there held that the legislature had the power to designate agencies for the maintenance of the common school system, and had the power to confer on them the *right to collect a tax.* The opinion of the court in considering the question of delegation to an appointive board, stated that as *the legislature had fixed the maximum limit,* there was no unlawful delegation of taxing power to an unrepresentative body. In a later case we said that was a legislative act. See *Duff v. Perry Twp. School Dist.,* supra, involving an elective board of the third district. It was contended, however, that a discretion existed in the board to choose between five and six mills. This was the first case to consider the limitation upon the legislature in regard to delegating the power of taxation, and it was argued that it was a dangerous practice to confer upon a board, which the people have no power to choose, or over which their power is remote and indirect, the authority to tax. But in the Act of 1911 there was no real delegation of

taxing power; the legislature had in effect fixed the tax. We cannot now hold the instant question was decided by this court in the *Minsinger* case. It was pointed out, however, that if an appointive board were given the power to levy a tax to meet its requirements, without legislative restriction, it would usurp the deliberative powers of the people. This consideration becomes intensely important in view of the holding there that "the school district is but the agency of the Commonwealth, and there is no inherent right in the electors of any particular locality to vote for directors; . . ." That statement is correct. There is nothing to prevent the legislature from making all school boards appointive, as it could create commissions to administer the highways in the state, the police forces and other strictly state activities, and give them the power to tax, if there is no limitation on the right of the legislature to delegate that power. Thus it could set up a metropolitan police district, comprising Philadelphia and the adjoining counties, and administered by a board empowered to levy a tax on the citizens of the several counties. To give these bodies the unrestricted right to levy a tax is unthinkable in a free country under our constitution. We have enough illustrations abroad to know what could happen. It is for the courts to enforce the constitutional mandate.

Other jurisdictions hold that the legislative power to tax cannot be conferred upon a merely appointive body: *State ex rel. Howe v. Mayor of City of Des Moines,* 103 Iowa 76, 72 N. W. 639; *Vallelly v. Board of Park Commissioners,* 16 N. D. 25, 111 N. W. 615; *Parks v. Wyandotte County,* 61 Fed. 436; *Inhabitants of Twp. of Bernards v. Allen,* 61 N. J. L. 228, 39 A. 716; *Schultes v. Eberly,* 82 Ala. 242, 2 S. 345; 1 Cooley on Taxation (3rd ed.), p. 99. These decisions seem to be based on the fact that the tax-levying authorities were nonelective bodies, that they were appointed without the consent of the people and, as pointed out, if such bodies may tax for

educational purposes, appointive bodies may tax for any other purpose.

It is contended, however, that the provisions of the Acts of 1921 and 1929 did not constitute a delegation of power because the legislature fixed a limit on the tax levy. This contention is not borne out by consideration of the component elements which form the basis for the determination of the annual school tax. Section 1 of the Act of 1929 provides:

"In all school districts of the first class, the school taxes for the following fiscal year shall be levied annually, by the Board of School Directors thereof, on or after the second Monday of November and before the first Monday of December following.

"The Board of School Directors thereof shall annually levy a tax on each dollar of the total assessment of all property assessed and certified for taxation in said district, which said tax shall be ascertained, determined, and fixed by adding together the following:

"(a) An amount which, with all moneys received from the Commonwealth applicable thereto, shall be sufficient to pay the minimum salaries and increments of the teaching and supervisory staff thereof as fixed and provided by law and to pay the contributions of said district to the teachers' retirement system.

"(b) An amount sufficient to pay the interest on, and retire the principal of, the indebtedness of said district at maturity.

"(c) An amount sufficient to pay all other expenses and requirements of said school district, which amount . . . for the tax year one thousand nine hundred and thirty-two and thereafter . . . shall be equivalent to not less than three, nor more than three and one-half mills on the dollar of the total assessment of all property assessed and certified for taxation therein."

The amount of tax to be levied under subsection (a) is variable. Although the salaries of teachers and members of the staff are fixed by law, the law does not fix the num-

ber of such employees. That is left to the judgment and discretion of the school directors. The School Code provides that the board shall employ the necessary qualified teachers. What would be "necessary" under this provision is a matter wholly within the administrative discretion of the board. The uncertainty of the tax rate comes from the uncertainty of the amount that is necessary to pay the teaching staff, which may be increased without outside interference. It would impose too great a burden on the courts to require them to investigate the many factors which enter into the number of "necessary qualified teachers." It is argued that the legislature itself has limited the number of teachers to those necessary "to keep the public schools open in their respective districts." But this still makes the necessary number of teachers dependent not only upon the number of schools in the district but upon the type of schools and upon the determination of the board of education as to the proper number of children to be placed in each class. It certainly could not be contended that the legislature desired to fix by this broad clause the number of schools in the district and the number of pupils to be instructed by one teacher. That remains a matter to be determined by the school directors. The Teachers Tenure Act of April 6, 1937, P. L. 213, while it serves to protect the teaching personnel from arbitrary dismissal, does not in any way impose a barrier to the employment of additional teachers in the future, and consequently has no bearing upon the ordinary discretion of the school board to determine its policy in this regard. The courts are in no position to exercise control over schools and determine the policy of school administration; the judges ordinarily are not equipped for this immense task. The divergent views of the modern educational trends, the different systems advanced for the education of children, the number of students that should be placed in each class so that the advantages of individual attention and instruction might be had, the different grades of instruc-

tion based upon mental aptitudes of students,—all these present serious questions which the school board alone can determine, and the employment of an indefinite number of additional instructors would be in their keeping. One factor alone, that of vocational training, with all the expensive equipment accompanying it, necessitates a large number of teachers. All this, being purely administrative, must be left to persons of experience who have made a life study of it, and certainly is not to be subjected to the consideration of jurists who have little or no training to appraise school systems or their necessities. It need not be stated that the salaries of teachers and staff members should be adequately provided for, and this comprises one of the most expensive items of maintenance. If unlimited taxing power is delegated to appointive school officials, a practice could readily grow up that would be tremendously burdensome to the taxpayers. An increase in the instructional staff would have a very material effect on the tax rate.

The other subsections, (b) and (c), contain definite restrictions with the exception possibly of the former, where the amount may be variable, although there is a maximum limit. But so long as the factor provided by subsection (a) is left entirely to the discretion of the school board, the entire rate equation is variable without limitation. The legislature has not under such circumstances enacted a rate, but has empowered the school board to fix it. Such was not true in the *Minsinger* case, and it is our considered judgment that here there is in fact an unconstitutional delegation of taxing power to an appointive board.

Delegation to a fact-finding body of the power to do something that is in itself circumscribed, after facts are found, is not the delegation of a legislative function. But where the delegation to a fact-finding body empowers it to create the conditions which constitute the fact, this is legislative. Here the determinative fact, the most material element entering into the tax, may be

created without restraint by the Board of Education. This determination can be nothing else than legislative.

This matter brings forward the question of school taxes generally throughout the State. Many criticisms have been voiced by large groups of taxpayers in Philadelphia, and elsewhere throughout the State, against the increasing burden of taxes for educational purposes. The feeling has been expressed that school officials, in attempting expensive innovations, erecting elaborate and ornate buildings, and in other ways, have departed from their fundamental duty to maintain an economical and adequate system of schools, with a sufficient number of well-paid teachers. It is charged that school boards have acted at times without considering the great burden the taxpayers must assume in paying for these palatial structures. While these matters are purely questions of policy over which this court has no control, we cannot help but notice the growing discontent springing from these criticisms. Costly edifices built at the tremendous expense of many, many millions, under a plan or scheme over which school directors or members of boards have little or no voice, are not productive of an efficient, well-paid teaching staff, nor do they advance one iota either the education or the educational advantages of the children. Less expensive and less burdensome structures, well built, will accomplish the same results, and taxpayers will not be made to suffer so much. In places where the boards are elective, liable to be called to account at the polls, the school directors are subject at least to some restraining influence in the expenditure of public funds, which does not exist where the school directors are appointed.

At this point it is urged that our decision in *American Baseball Club of Phila. v. Phila.*, 312 Pa. 311, is important. The appointment of the officers to guard a baseball park cannot be considered on the same plane as the determination of a teaching policy or system and the necessary persons to accomplish the result. The selection

of police officers was a mere matter of detail, entrusted to the police official by the city and not the surrender of an important power by the General Assembly. We have always held where the constitutional question of delegation of power is raised, that the delegation merely of details of administration is not in violation of the fundamental law. It was pointed out in that case that, if the power to select the number of policemen was abused by the officer, the courts would correct the abuse of discretion. The power delegated to the police officer by city council was very different from that which the legislature has attempted to delegate to the school board. In that case the rate was fixed, but its application was left to depend upon extraneous facts to be found by the administrative official. It was only necessary for him to determine the capacity of the stadium, the probable attendance, and the number of police who would ordinarily be required to preserve the public safety at such a gathering. The determination of these facts was a simple administrative function of minor importance and one which could be easily subjected to judicial review. The power conferred upon the school board is vastly different, as pointed out above. It was emphasized in *Hibbs v. Arensberg,* 276 Pa. 24, that the exercise of discretion by the school authorities will be interfered with only when there is a *clear abuse* of it, and the burden of showing such an abuse is a *heavy one.* In those few instances where the court has interfered with the administrative power of school boards, the interference was based on the school boards' manifestly illegal action in violating the express words of statutes defining their powers or on facts clearly indicating bad faith and violation of their public duty. See *Bender v. School Directors,* 182 Pa. 251; *Lamb v. Redding,* 234 Pa. 481; *Zimmerman v. Miller,* 237 Pa. 616; *Gemmell v. Fox,* 241 Pa. 146; *Hibbs v. Arensberg,* supra. But this court has definitely stated that it will not question the *policies* of school authorities so long as the board is acting within

the scope of its statutory authority and in good faith: *Lamb v. Redding,* supra, at p. 486.

Moreover, the license fee in the *American Baseball Club* case was not a tax within the constitutional meaning. It was not a levy upon all property owners for public purposes, but merely a charge imposed upon certain individuals for special services rendered them by the police force. Its purpose was not to provide a source of revenue to meet future expenses, but merely to compensate the city for work actually performed. It was an exercise of the police power. Such fees are not strictly taxes. See *Arronson v. Phila.,* 16 D. & C. 427, where Mr. Justice STERN, then judge of the court of common pleas, said of a similar license fee: "Such a charge is not regarded as in any sense a revenue-producing measure or as the imposition of a tax. It is merely making the person who causes the expense pay for it." See also *Point Bridge Co. v. Pittsburgh Rys. Co.,* 240 Pa. 105, 115; *Kittanning Borough v. Natural Gas Co.,* 26 Pa. Superior Ct. 355; *Atlantic & Pacific Tel. Co. v. Phila.,* 190 U. S. 160.

Another objection to the Act of 1929 is that it is unconstitutional because of Article III, section 20. This section prohibits the delegation to any special commission of the legislature's power to tax. The purpose of the provision was to protect against the exercise of the taxing power by officials not subject to the control of the people. This prohibition is not limited solely to municipal taxation. The words "to levy taxes" are not modified by the word "municipal," whereas the remaining clauses in this section are specifically so modified. This demonstrates the intention of the framers that no taxing power whatever, state or municipal, be delegated to any special, appointive commission. The section becomes an express and emphatic limitation on the power of the legislature to delegate to a non-elective board or commission the power to tax. But it is urged the school board is not a "special commission" because at the time the

legislature invested it with taxing power, it was an existing governmental body or agency, regularly constituted and exercising general administrative powers in connection with the public school system of the State. It is quite true it was such a body or agency and could lawfully exercise all the legitimate powers granted to it, whether or not it is a special commission for such purposes. It is the established governmental agency for the administration of the educational system. But when the taxing power was lodged in it, it was *quoad* that power a special, appointive commission. It must be remembered that the taxing power is a separate special power, and is not a component part of the power to educate. When an appointive school board, which is a board of education, is empowered to levy taxes, it is a special commission to levy taxes. The case in this respect is analogous to *Perkins v. Philadelphia,* 156 Pa. 554, where a like objection had been urged. There, an attempt having been made to transfer municipal powers to the head of the existing department of public works in Philadelphia, a general agency of government, in violation of this section, we unequivocally said at p. 559: "The fact is not material that the new commissioner was already by general law an officer of the city; the special and unusual power given him, to be exercised in a special manner, . . . constituted the special commission delegated to him."

As stated by Mr. Justice LINN in *Tranter v. Allegheny County Authority,* 316 Pa. 65, the main purpose of Article III, section 20, was to correct the recognized economic mistake of taking the fiscal power away from the regular, legislative body and putting it in the hands of an appointive commission, organized for special purposes and not subject to the control of the people. Here the effect of the delegation by the General Assembly is to vest in the school board the unlimited power of increasing expenses, plus the right to levy a tax in an amount sufficient to cover the expenditures to be incurred. The

Constitution prohibits this, and this court must give effect to the mandate of its framers.

The doctrine of equitable estoppel is urged as precluding an attack on the constitutionality of the act. The Act of 1929 is almost identical with the Act of 1921 in so far as taxation is concerned; in all these years no one has voiced an objection to its constitutionality. We have not been able to discover any case which holds that laches will bar an attack upon the constitutionality of a statute as to its future operation, especially where the legislation involves a fundamental question going to the very roots of our representative form of government and concerning one of its highest prerogatives. To so hold would establish a dangerous precedent, the evil effect of which might reach far beyond present expectations. While dictum in *McGuire v. Phila. (No. 1)*, 245 Pa. 287, 293, involving the borrowing capacity of municipalities, indicates delay might bar a constitutional challenge of a statute, the cases cited therein in support of this proposition go no further than to establish that, where a statute has been in force for many years without any question as to its constitutionality being raised and engagements have been entered into on the strength of its validity, the court will not undertake the drastic measure of wiping it off the statute books unless it is convinced beyond all peradventure of doubt that it violates a provision of the fundamental law. Justice MITCHELL in *Com. v. Gilligan*, 195 Pa. 504, 511, expressly declares that laches will not ipso facto operate to prevent the court from declaring an act void in violation of the constitution. See *Page v. Carr*, 232 Pa. 371, 376. In the instant case, it has been shown beyond all doubt that the statutory provision delegating the taxing power to a nonelective school board, of which the control of the people is remote and indirect, violates one of the most fundamental principles of our constitution, and this court must perform its duty, in spite of the delay.

It has been brought to our attention that the decision rendered by the court below has resulted in the institution of suits by taxpayers to recover the school taxes which they have paid in the past and which were levied by the school board illegally under the unconstitutional statutory provision. This court has uniformly adhered to the well-established rule that "money voluntarily paid on a claim of right, where there has been no mistake of fact, cannot be recovered back on the ground that the party supposed he was bound in law to pay it when in truth he was not": *Union Ins. Co. v. City of Allegheny,* 101 Pa. 250, 255. In that case Justice MERCUR set forth the requisites to the maintenance of an action to recover back tax payments: the tax must have been void, the money received by the municipal corporation, and the payment by the plaintiff made under compulsion. Unless these elements are present, mere protest is of no avail in the absence of a statutory right permitting recovery on a different basis. In *Phila. & Reading C. & I. Co. v. Tamaqua Borough School District,* 304 Pa. 489, 494, the same principle is enunciated: "Undoubtedly, the well established rule in this State is that a voluntary payment of taxes to the public authorities, without any duress, threats, or misstatements on the part of the latter, or protest and notice of intention to reclaim on the part of the taxpayer, precludes subsequent recovery of any overpayment: *Shenango Furnace Co. v. Fairfield Twp.,* 229 Pa. 357; *McCrickart v. Pittsburgh,* 88 Pa. 133. If the payment was a voluntary one, it may not be recovered unless a statute so provides: *Investor's Realty Co. v. Harrisburg,* 281 Pa. 200." See *Kennedy's Estate,* 321 Pa. 225, 233-234. In view of these authorities, no taxes which have been voluntarily paid in the past can now be recovered without the aid of a statutory remedy.

It is likewise true that the efforts of delinquent taxpayers, who have remained silent and have not made known their intention to withhold payment on the

ground that the taxes were levied pursuant to an unconstitutional statute, will be unavailing. No principle has become more firmly established in the field of constitutional law than the fact that a person may effectively by acts or omission waive a constitutional right to the protection of which he would otherwise be entitled, provided the waiver does not run counter to public policy or public morals. This is nothing more than the equitable doctrine of estoppel applied in the realm of constitutional law and is uniformly upheld in cases where the constitutional provision is solely protective of property rights. See 1 Cooley's Constitutional Limitations (8th ed.), p. 368 et seq.; *Pierce v. Somerset Ry.*, 171 U. S. 641, 648.

It is recognized that the protection afforded by the constitution against unlawful taxation is in defense of private property, and hence being in protection of a property right may be waived at the option of the property owner: *Bidwell v. City of Pittsburgh*, 85 Pa. 412. This court there held that the constitutional right against unjust taxation is for the protection of the taxpayer's private property; it is stated at p. 418: "He may waive that protection and consent to such action in regard to it as would otherwise be invalid." In *Shepard v. Barron*, 194 U. S. 553, it is pointed out at p. 567, that a "course of conduct which renders it unjust and inequitable to others that he [the taxpayer] should be allowed to complain of the illegality" may amount to a waiver; and that some courts have held that "a mere failure to give notice of objections to one who, with the knowledge of the person taxed, as contractor or otherwise, is expending money in reliance upon payment from the taxes, may have the same effect." While in most cases where a waiver has been found, the conduct of the party has consisted in the invocation of the act which he later seeks to attack and the acceptance of benefits therefrom, nevertheless, mere inaction may constitute a waiver, where the party knows that others are go-

ing ahead and making expenditures on the faith of the validity of the claim against him, and the circumstances are such as to make it inequitable to permit subsequent invocation of a constitutional right which he has failed to assert seasonably and within a reasonable time after the claim arose. See *City of Sebring v. Wolf,* 141 So. 736. In the case at bar it is undisputed that each year the school board has merely levied a tax to provide sufficient revenue to meet the expenses which the budget indicates would be incurred by the operation of the school system during the year. Large investments and commitments were entered into upon the strength of the validity of these past tax levies. Debts have been incurred and bond issues floated which would be put in jeopardy if the delinquent taxes are now immune from collection. Furthermore, it would be unjust and inequitable to deny recovery to those who made prompt payment in compliance with the assessments and levies, and at the same time to hold immune those who did not meet their tax obligations as they fell due.

In view of the presumption in favor of the constitutionality of all acts of legislature, the burden rested upon the taxpayers to show that the taxing power exercised by the school board was in violation of the constitution. At the time the now delinquent school taxes were levied, the property owners who became liable for the payment thereof realized that the revenues to be derived from their payment would be counted on to supply the funds necessary to meet the obligations incurred in the administration of the public school system. In order to avail themselves of the right to attack the validity of the tax levies, it was incumbent upon them to make known their intention to resist payment. They could not sit by and permit the school board to rely upon payment of their taxes to its detriment and to the detriment of other taxpayers. To permit a delinquent taxpayer to raise a constitutional objection to the validity of the claim against him, after expenses have been incurred in

reliance on his future payment, would be for the court to completely shut its eyes to equity and place an unjust burden on future generations. Once a taxpayer has omitted to voice his objection within a reasonable time after the levy has been made and with knowledge that his claim will be made the basis of expenditures to be incurred, and the expenditures have been made, it is too late for him to attempt to impeach the validity of the tax levy. Under such circumstances he must be deemed to have waived all right to assert any constitutional objection which might have afforded him protection had he chosen to invoke it at the proper time. Any other course would imperil all governmental agencies under similar circumstances.

The only unconstitutional feature of the statute here considered is the delegation of the power to an appointive commission to levy taxes; it is the only one here dealt with; no other provisions are challenged and as to these the Act will continue effective. In this connection we may say the constitution gives the school board the right and power to create an indebtedness and issue bonds or notes. All its implications must be upheld and enforced.

Appellants stress the fact that if the decision of the court below is allowed to stand, and the taxing power of the school board restricted to the maximum permitted by the Act of June 21, 1919, P. L. 555, supra—not less than 6 nor more than 8½ mills upon each dollar of the assessed value of taxable property—the effect will be to "destroy the public confidence in millions of outstanding school bonds . . . [and] harass and embarrass school boards throughout the Commonwealth in floating new issues as well as in meeting past and current obligations." They prophesy that this will result "in temporary disruption and paralysis of the common school system to no good purpose" and that the damaging and disrupting effect will be immediate and direct.

It is a matter of common knowledge that the school system in the City of Philadelphia could not operate on such a restricted basis, pay teachers salaries and fulfill the needs of the thousands of children whose education and welfare are intrusted to its care. Such a curtailment would bring about a state of confusion which would operate adversely to the common good of the citizens and their children. While these disconcerting factors cannot permit this court to avoid the unpleasant duty of declaring unconstitutional a statute which violates one of the most fundamental principles of the state constitution, yet they must be taken into consideration in determining whether the threatened emergency of serious proportions compels this court to invoke its general power to suspend or stay the operation of an injunction decree, on a modified basis, until the legislature convenes in regular session, when it may pass the necessary enabling statute, so that in the interim the schools may have ample means to function without an injurious curtailment of revenue.

The Act of June 16, 1836, P. L. 784, Section 13 confers chancery powers, ". . . so far as relates to: . . . V. The prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals." Moreover, the Act of May 20, 1891, P. L. 101, section 2, confers upon this court the power "to enter such judgment, order or decree in the case as . . . [it] may deem proper and just. . . ." These acts with other acts and the constitution lodge in this court great powers over judgments or decrees. This court may grant under this authority such relief as justice requires. We had occasion to invoke this power recently in *Sinking Fund Comm'rs of Phila. v. Phila.*, 324 Pa. 129, where we granted relief in the enforcement of a judgment in mandamus to ameliorate the effect of strict enforcement which it was claimed would be oppressive and burdensome.

We do not hesitate in many other matters to use this power where necessary. The circumstances here demanding relief are even weightier than in other cases where relief has been afforded, and this court will do everything in its power to bring about an equitable solution of the difficulties presented, so that the debt service charge and the salaries of all teachers may be paid without diminution. The school board must have some means of securing the necessary sums for school purposes for the years 1938 and 1939; in the latter year the legislature will be in regular session and may, if it sees fit to do so, pass an enabling act that will provide for ensuing years. Under these circumstances, it will not be necessary to call the legislature in special session to secure relief. Considering the situation of the taxpayers and the maintenance of public schools, and the delay of plaintiff in instituting these proceedings until a time when the legislature was not in session, we will modify the decree of the court below and permit a tax levy not to exceed the rate levied by the board itself for the year 1937. This was the last rate; it was not contested by anyone and was accepted as fair by all the citizens taxed. It was the basis on which public obligations have been incurred for benefit of every taxpayer and resident in the city. A careful administration of this tax return with the proposed bond issue to make up the deficiencies for past years will enable all schools to function as usual, until such time as the legislature deems it necessary to consider the subject.

Had this bill been brought promptly after the adoption of the unconstitutional portions of the Act of 1929, and at a time when the legislature was regularly convened, it would have been unnecessary for this court to invoke its power to modify the decree to provide a means whereby the school district might continue its important functions without disastrous interruption. Under the actual circumstances, however, appellees' delay has created a situation which could be remedied only by a

special session of the General Assembly. This would involve burdensome expense to the taxpayers of the Commonwealth as well as dangerous delay in the interim. These considerations make imperative the invocation of our inherent equity power to modify or alter decrees to meet the requirements of justice.

The decree appealed from is modified; the defendants, severally and jointly, are restrained from levying a school tax in excess of nine and one-quarter mills on the assessed valuation; leave is granted to levy such tax not to exceed said rate for the years 1938 and 1939; this court will retain the record and jurisdiction of the case for such further action as, on proper application, may be shown to be necessary. Each party shall pay its own costs.

SUPPLEMENTAL OPINION, PER CURIAM, November 29, 1937:

The court having retained the record and jurisdiction of this case for such further action as, on proper application, may be shown to be necessary, and application having been made to supplement the opinion of the court so far as it refers to debt service and the taxes applicable thereto, both parties agreeing that such elaboration is desirable, it is now further stated that nothing in the opinion heretofore filed was intended to or shall be taken or held to cast any doubt upon the power of the School District of the City of Philadelphia to borrow money for its proper corporate purposes, and to issue bonds to secure such indebtedness or in any way to vary the rule of law announced in *Hillman Coal & Coke Co. v. Jenner Township,* 300 Pa. 108, 150 A. 293, that the debt service charges must be first provided for out of taxes levied each year. This rule is applicable to all bond issues of the Philadelphia School District, present and prospective, provided, however, that the total tax levy shall not exceed the sum of nine and one-quarter mills for all purposes.