Irwin Borough School District *v.* North Huntingdon Township School District, Appellant.

Argued September 29, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Robert W. Smith,* with him *M. M. Bergad* and *Smith, Best & Horn,* for appellant.

*Louis E. Sensenich,* for appellee.

*Carroll Caruthers,* with him *Harry L. Allshouse,* for intervenors.

OPINION BY MR. JUSTICE HORACE STERN, November 24, 1947:

The controlling question in this proceeding is whether school districts, in establishing a joint school, may legally provide that their agreement for that purpose shall remain in force for only a designated period of years.

On February 6, 1915 the School District of the Borough of Irwin and the School District of the Township of North Huntingdon, being contiguous school districts in the County of Westmoreland, entered into an agreement, approved by a majority vote of the directors of each district, to establish and maintain a joint high school to be located on a site partly in the Borough and partly in the Township and to be known as "Norwin High School". The cost of acquiring the land and erecting and equipping the building was to be shared by the

districts equally and the title vested in them in the same proportion; the expense of maintaining the school was to be borne in proportion to the relative yearly attendance of pupils from each district.

The twelfth paragraph of the agreement was as follows: "This agreement shall be and remain in force for a period of thirty years from the date of the execution thereof, but the same may be cancelled and the said High School discontinued at any time by the majority vote of the directors of each of the said districts. In case of such cancellation the property in North Huntingdon Township shall be taken by the School District of North Huntingdon Township, and the property in Irwin Borough shall be taken by the School District of Irwin Borough, and settlement made by the district so taking with the other district upon a valuation which the districts, parties hereto, may agree upon within ninety days after the cancellation of this agreement; or in the event of their being unable to agree within ninety days, as aforesaid, on a valuation of the said property, then the same shall be exposed to public sale after public notice for thirty days, and sold to the highest bidder. The proceeds of such sale shall be divided between the districts in the same proportions as they contributed to the original cost."

The land was purchased and the high school building erected. In 1936 the districts joined in the erection of an additional building. In 1944 the main portion of the original building was destroyed by fire; the proceeds of the insurance policies were divided equally between the districts.

At a joint meeting of the two school boards on February 12, 1945 the Borough School Board proposed, and the meeting unanimously adopted, a resolution "that the present contract be continued to July 1, 1946, and thereafter from year to year until the joint board can agree upon a building program that will provide ample facilities for the education of all high school students

of both districts, at which time a term contract should be executed. Either board shall have the right to terminate the year to year contract by giving ninety days written notice of its intention so to do prior to the beginning of the next contract year."

The attempt to agree upon a building program proving unsuccessful, at a meeting of the Township School Board on February 12, 1946, that board adopted a resolution "That the agreement between the North Huntingdon Township School District and Irwin Borough School District be terminated effective as of July 1st, 1946." A copy of this resolution was duly sent to the Borough School Board. At a joint meeting of the two boards held June 4, 1946 all the members of the Borough School Board voted in favor of a resolution that Norwin High School "be not discontinued", but a majority of the members of the Township School Board voted against it.

At a joint meeting of the two boards on July 12, 1946, the Borough School Board declared "that the action taken by the Township Board to dissolve Norwin did not constitute a dissolution, but in view of the position of the North Huntingdon Board that it did constitute a dissolution, it would be impractical to attempt joint operation of Norwin at the present time. The Irwin Board will therefore establish its own high school, reserving the right to maintain that the Norwin contract is still in effect." Thereafter the Borough School District conducted its own high school in its junior high school building, while the Township School District maintained its high school in what remained of the joint school buildings following the fire. Both of these schools operated through the school year 1946-47 and are now operating through the current school year, and each district has received accredited standing for its high school from the Department of Education of the Commonwealth.

The Borough School Board having raised a question as to the right of the Township School Board to give notice of termination of the joint operation of Norwin High School as of July 1, 1946 on the ground that such termination could not, in any event, be effected until July 1, 1947, the Township School Board, by way of precaution, adopted a new resolution on March 24, 1947 declaring a termination as of July 1, 1947 and sent a copy thereof to the Borough School Board.

The Directors of the Borough School District, asserting that the status of the Norwin High School was undetermined, the welfare of the pupils prejudiced, and the status of the contracts of the teachers uncertain, filed a petition for a declaratory judgment to determine whether the agreement between the districts for the joint operation of the school had been legally terminated, and, if so, what the procedure should be for disposing of the assets jointly owned. The court decreed that the provision that the agreement should remain in force for a prescribed period of thirty years was illegal and in violation of section 1808 of the School Code of May 18, 1911, P. L. 309, and that Norwin High School must continue under the control and management of the joint board unless and until the cancellation of the agreement be approved by a majority vote of the school directors of each district. The Township School District appeals from that decree.

There is nothing in the School Code of 1911 which, either expressly or impliedly, forbids school districts from establishing a joint school for a limited, specified period. On the contrary, all the provisions of Article XVIII of the Code indicate that the boards of school directors were to have full latitude in arranging all the terms and conditions of the joinder. Section 1801 provides that the cost of constructing, equipping and maintaining such a school should be paid by the districts "in such manner and in such proportion as they may agree upon." Section 1802 provides that title to the real estate

should be held in the name of one or more of the districts as they may agree. Section 1803 provides that no such school should be established unless the districts first entered into a written agreement "that such proposed joint school . . . shall be established and maintained by the several districts, in such manner and proportion, *and upon such terms* as the several districts may then agree upon." Certainly the permission to fix by agreement the terms upon which a joint school should be established and maintained includes the right to determine by such agreement the period of its duration. It is true that section 1808 provides that the school districts establishing a joint school may at any time by a majority vote of the school directors of their respective districts discontinue the school, but such method of discontinuance is permissive, not mandatory or exclusive, and is preserved in the present agreement by a provision in practically the same language as the statute, the term of thirty years being designated merely as the *maximum* period that the agreement should continue. Indeed it would seem to be a wise policy of the law to permit school districts to agree on the maintenance of a joint school for only a limited or experimental period since a district might be reluctant to enter into an agreement which it must suffer to exist in perpetuity unless the other district should be willing at some future time to consent to a cancellation; changes of population or other circumstances might make it advantageous to the one and correspondingly disadvantageous to the other district to discontinue the school, with a resulting impasse detrimental to the best interests of all concerned. It may be pointed out that an agreement for a designated period is, after all, nothing but an *advance* consent by both parties to the discontinuance of the school at the end of that period, nor does this encroach upon the freedom of action of future boards since the latter would have the power, at the end of the period named in the agreement, to continue the joint school if the boards of both districts should so desire.

The Borough School District contends—and with justification—that the notice of termination given by the Township School Board on February 12, 1946 was ineffective because, according to the phraseology of the resolution of February 12, 1945, there could not be any termination until July 1, 1947. The resolution provided for the continuation of the thirty year agreement until July 1, 1946, and *"thereafter from year to year. . . . Either board shall have the right to terminate the year to year contract* by giving ninety days written notice of its intention so to do prior to the beginning of the next contract year." Under this provision the "year to year contract" began July 1, 1946, and—giving the word "terminate" its ordinary meaning—the parties could scarcely have meant that it should be subject to "termination" before it had begun. But the Township Board gave a second notice on March 24, 1947 declaring a termination as of July 1, 1947, and certainly to that notice there can be no valid objection. The right to terminate was not dependent upon a failure to agree on a building program; it was absolute and unconditional except for the obligation to give the required notice.

We hold, therefore, (1) that both the agreement of February 6, 1915 and the resolution of February 12, 1945 were legal in all respects and (2) that the contractual relationship between these two school districts was terminated and the joint school discontinued as of July 1, 1947. The agreement wisely provided for an amicable settlement in regard to the disposition of the joint property, and, since the parties were, in good faith, uncertain as to the validity of the attempted cancellation of the agreement, they should now have the benefit of the ninety day period therein stipulated in which to negotiate a settlement as to the property jointly owned by them and to adjust all the other problems arising from the liquidation of the joint project; if, unfortunately, they fail to achieve harmony within that period, then, as the agree-

ment provides, there must be a public sale of the property, the proceeds, in accordance with the provisions of the agreement and section 1808 of the School Code, to be divided between the districts in the proportions in which they contributed to the original cost.

Decree reversed, and record remanded with direction to enter a decree in accordance with this opinion. Costs to be divided between the parties.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

The one basically vital question in this case is whether two or more school districts, acting to establish a joint school as authorized by Sec. 1801 of the School Code,[1] may provide in the required written agreement (see Sec. 1803) a fixed period for the duration of the agreement and the continuance of the joint school. The question arises under an agreement of February 6, 1915, between the plaintiff and defendant school districts for the establishment and maintenance of a joint high school. Paragraph "Twelfth" of the agreement provides, in part here material, that "This agreement shall be and remain in force for a period of thirty years from the date of the execution thereof, . . .". The paragraph contains a further clause that "the [agreement] may be cancelled and the said High School discontinued at any time by the majority vote of the directors of each of the said districts", as, of course, it manifestly could be. Does not Sec. 1808 of the Code, itself, direct that "The several school districts establishing any joint school . . . may, at any time by a majority vote of the school directors of their respective districts, discontinue any such joint school . . ."? How, then, can any *inter partes* arrangement in such connection validly add to or transgress the relevant provisions of the Code?

———

[1] Act of May 18, 1911, P. L. 309, Art. XVIII, which embraces Secs. 1801 to 1808, both inclusive, and relates to "Joint Schools", 24 PS § 1611 et seq.

The learned court below held, and I think rightly, that the stipulation in the agreement here involved that it should "be and remain in force for a period of thirty years" was in direct conflict with Sec. 1808 of the Code and was, therefore, a nullity; and, further that inasmuch as the joint high school in question has not yet been discontinued by a majority vote of the school directors of the respective districts, as required by Sec. 1808, the agreement continues in full force and effect.

But, this court now holds to the contrary on the basis of an inference which it derives from the provision in Sec. 1803 that ". . . the several districts intending to establish [a joint school] . . . shall first enter into . . . a written agreement . . . that such proposed joint school . . . shall be established and maintained by the several districts, in such manner and proportion, and upon such terms as the several districts may then agree upon, . . .". From that provision, the majority of this court forthwith infer that one of the permissible terms of the agreement for a joint school is the fixing of a period of years for the duration of the agreement. Thus the majority concludes,—"Certainly the permission to fix by agreement the terms upon which a joint school should be established and maintained includes the right to determine by such agreement the period of its duration". But, that does not logically follow by any means. In reality, the inference amounts to judicial interpolation in Sec. 1803 of a wholly non-germane matter. What Sec. 1803 deals with is the *establishment and maintenance* and *not with the discontinuance of a joint school.* For the latter eventuality Sec. 1808 is the competent enactment which prescribes the means for discontinuing a joint school once it is established and maintained in accordance with the written agreement provided for by Sec. 1803.

Not only is there no reasonable ground for reading into Sec. 1803 something not within the purview of its plain words, but the reciprocal attendant impingement

upon what the legislature did provide in Sec. 1808, relative to the discontinuance of a joint school, constitutes a direct violation of old and well-established rules of statutory construction. "Every law shall be construed, if possible, to give effect to all its provisions": Statutory Construction Act of May 28, 1937, P. L. 1019, Art. IV, Sec. 51, 46 PS §551. And, that means *full* effect. The presumption is "That the Legislature intends the entire statute to be effective and certain": Statutory Construction Act, cit. supra, Art. IV, Sec. 52, 46 PS §552. If school districts are to be permitted to prescribe a fixed period for the maximum duration of an agreement for the establishment and maintenance of a joint school, then the intendment of Sec. 1808 will be effectively circumvented to a large extent. The time comes, as in the instant case, when the joint school is discontinued without a majority vote of the school directors of the respective districts contrary to the plain intendment of Sec. 1808.

In justification of the construction thus placed upon the pertinent sections of the School Code, the majority opine that ". . . it would seem to be a wise policy of the law to permit school districts to agree on the maintenance of a joint school for only a limited or experimental period . . .", specifying a variety of reasons. But, the answer to that suggestion is that any question of policy concerning the maintenance or operation of the public schools is primarily and peculiarly a matter for the legislature. It is not to be overlooked that the parties litigant in this case are coördinate agencies of the Commonwealth within their respective districts for public school purposes and that their present controversy arises out of their agreement for the establishment and maintenance of a joint high school,—a matter fully qualifying as the concern and responsibility of the General Assembly by virtue of specific constitutional mandate: Article X, Section 1, of the Pennsylvania Constitution. In *Wilson v. Philadelphia School District*, 328 Pa. 225, 231, 195 A. 90, this court noted that "The Constitution of 1874

. . . directed *the legislature* to maintain 'a thorough and efficient system of public schools': Article X, Section 1. The school system, or *the school districts,* then, *are but agencies of the state legislature* to administer this constitutional duty". (Emphasis supplied).

Indeed, it is not easy to understand why, in a case such as this, we do not, by rule, require notice to the Superintendent of Public Instruction with leave to him to appear and be heard. Compare the amendment of May 13, 1925, P. L. 634, Sec. 2, 24 PS §1633, which provides that "The State Council of Education is hereby authorized and directed to investigate and to aid in the establishment of consolidated and joint consolidated schools, and to inspect and approve such schools, as hereinafter provided". It will hardly be disputed that the State's interest in the matter is both evident and extensive and may be seriously affected in its absence. Because of the constitutionally imposed burden in respect of the public schools, as above shown, the legislature's duty in the premises is by no means at an end upon the enactment of a statute relating to the public schools. Any thought, therefore, that the reciprocal obligations and commitments of school districts, duly assumed and made under direct legislative authority for the establishment and maintenance of joint schools (Art. XVIII of the School Code), are to be judicially contemplated as private rights are contemplated and dealt with as the Law Merchant might ordain for private individuals is to my mind a patent misconception.

Insofar as judicial inquiry into policy may be appropriate in the ascertainment and enforcement of legislative intent, I suggest that the cogent reasons are on the side of preventing the discontinuance of a joint school except upon the majority vote of the school directors of the respective signatory districts as Sec. 1808 provides.

The majority say that ". . . . an agreement for a designated period is, after all, nothing but an *advance*

consent by both parties to the discontinuance of the school at the end of that period . . .". But, why should the school directors of one generation act conclusively in an important school matter many years in advance of the time that such action is designed to become effective? Contrary to the view of the majority, to so determine the discontinuance of a joint school at some definite date in the remote future does ". . . encroach upon the freedom of action of future boards", for, while ". . . the latter would have the power, at the end of the period named in the agreement, to continue the joint school", the continuance would occur only ". . . if the boards of both districts should so desire",—a situation which is diametrically the reverse of the intendment of Sec. 1808. Thus, instead of majority action of the directors of the respective districts for the discontinuance of a joint school, as Sec. 1808 contemplates, under the construction now placed by this court upon the provisions of Article XVIII of the School Code, it will require majority action of the directors of the respective districts to *continue* a joint school after a specified period of years when, in nine out of ten of such cases, the joint school will very likely be more to the advantage of one of the participant districts than to the other. But, that furnishes no real justification for an *ex parte* discontinuance of a joint school. The supposedly disproportionate burdens and benefits to the respective districts after a period of operation is a foreseeable possibility from the day a joint school is established. That contingency is outweighed by the advantages to be had by the pupils of both districts from the joint school. And, if they are to be maintained, when once established, without disruption, then their discontinuance should be judicially discountenanced except when that is accomplished in the manner specified by the legislature in Sec. 1808 of the School Code. Neither board of respective contracting districts can properly be elevated to the position of exclusive agent of the State for determining whether a

joint school should be discontinued: cf. *Walker's Appeal,* 332 Pa. 488, 492, 2 A. 2d 770.

The whole legislative scheme of joint schools is that action for such a school ". . . shall be by a majority vote of each of the separate district boards which make up a joint board [7] [the footnote cites Sec. 1804 of the School Code]. Each district is powerless to act alone, *nor may the joint board act on a simple majority vote of its members": Walker's Appeal,* loc. cit. supra. (Emphasis supplied). Yet, in the instant case, in a matter so vital to an established joint school as the question of its continuance, the action to discontinue was taken by even less than "a simple majority vote of its [the joint board's] members". As the record in this case shows, the five members of the board of the Irwin School District voted unanimously *not* to discontinue the joint school, while but five of the seven members of the board of the North Huntingdon Township School District voted to discontinue, *the other two members voting not to discontinue,* for an aggregate vote among the whole number of the members of the joint board of seven to five *not* to discontinue.

For the reasons herein given, which the learned court below so clearly set forth, I think the decree should be affirmed, and, accordingly, dissent.